John P. Flynn, SBN 141094
JFlynn@wsgr.com
Colleen Bal, SBN 167637
CBal@wsgr.com
Charles T. Graves, SBN 197923
TGraves@wsgr.com
Joshua A. Baskin, SBN 294971
JBaskin@wsgr.com
Stephanie C. Cheng, SBN 319856
(Admission Pending)
Stephanie.Cheng @wsgr.com
WILSON SONSINI GOODRICH & ROSATI
1 Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105-1126
Telephone: 415.947.2000
Facsimile: 866.974.7329

Attorneys for Plaintiff
ARCTURUS THERAPEUTICS, INC

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCTURUS THERAPEUTICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ABBVIE INC., CAPSTAN THERAPEUTICS, INC., PRIYA KARMALI, STEVEN P. TANIS, AND S.P. TANIS PHARMACHEM CONSULTING LLC, D/B/A SPTANIS PHARMACHEM CONSULTING LLC, and DOES 1-100,<br><br>Defendants. | CASE NO.: '25CV2494 W  AHG<br><br>**COMPLAINT FOR (1) BREACH OF CONTRACT; (2) BREACH OF CONTRACT; (3) TORTIOUS INTERFERENCE WITH CONTRACT; (4) BREACH OF CONTRACT; (5) MISAPPROPRIATION OF TRADE SECRETS (DTSA); (6) MISAPPROPRIATION OF TRADE SECRETS (CALIFORNIA UTSA); (7) CORRECTION OF INVENTORSHIP; (8) DECLARATORY JUDGMENT**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

Arcturus Therapeutics, Inc. ("Plaintiff" or "Arcturus") for its Complaint against Defendants AbbVie Inc., Capstan Therapeutics, Inc., Priya Karmali, Steven P. Tanis, and S.P. Tanis PharmaChem Consulting LLC, d/b/a SPTanis PharmaChem Consulting LLC, and Does 1-100, states as follows:

## INTRODUCTION

1.    In June 2025, AbbVie Inc. ("AbbVie") announced its intention to acquire Capstan Therapeutics, Inc. ("Capstan"), including what it described as "CPTX2309, a potential first-in-class in vivo tLNP anti-CD19 CAR-T therapy candidate, currently in Phase 1[.]" The announcement also stated that AbbVie would acquire Capstan's tLNP platform technology designed to deliver RNA payloads. AbbVie closed that transaction in August 2025 – reportedly on terms that included a cash payment of some 2.1 billion dollars to Capstan.

2.    On information and belief, Capstan's acquisition value consisted primarily of trade secrets its personnel had misappropriated from Arcturus.  In January 2022, Capstan hired Defendant Priya Karmali, a long-time Arcturus employee, to become its Chief Technology Officer.  Capstan also retained Defendant Steven P. Tanis, who was working as a consultant for Arcturus to develop novel lipids for its lipid nanoparticle (LNP) drug delivery platform, and had been in that role for many years.  Tanis remained an active Arcturus consultant even while he covertly worked for Capstan.  Within just three months of Karmali's hire, Capstan filed a patent application which misused Arcturus trade secrets and identified Karmali and Tanis as the only two inventors.  All the while, Tanis continued billing Arcturus and performing services for Arcturus without disclosing the concealed conflict of interest and trade secret misappropriation.  Arcturus only discovered the misconduct in late 2023, almost two years after Karmali's departure from Arcturus, when it learned of the publication of Capstan's patent application.

3.    Arcturus wrote Capstan regarding its initial concerns in April 2024.  In an April 2024 response, Capstan provided no justification for its actions.  Since then,

1  Arcturus' investigation has shown that the misappropriation and misconduct ran
2  deeper than it first realized.

3       4.    Capstan parlayed its misuse of Arcturus trade secrets into its acquisition
4  by AbbVie.  AbbVie had notice of the other Defendants' misconduct.  Among other
5  things, it was aware of the April 2024 letter.  AbbVie and its new Capstan subsidiary
6  now plan to proceed with the continuing misuse.

## PARTIES

8       5.    Plaintiff Arcturus is a messenger RNA (mRNA) medicines company
9  leveraging its cutting-edge lipid delivery technology in the development of liver and
10  respiratory rare disease therapeutics and infectious disease vaccines.  Founded in
11  2013, Arcturus is a Delaware corporation headquartered in San Diego, California.

12      6.    Defendant AbbVie Inc. is a Delaware corporation headquartered in
13  North Chicago, Illinois.

14      7.    Defendant Capstan Therapeutics, Inc. is a Delaware corporation
15  incorporated in 2020 that is headquartered in San Diego, California. As of August
16  19, 2025, Capstan became a subsidiary of AbbVie.

17      8.    Defendant Steven P. Tanis ("Tanis") is an individual who resides at
18  1750 Oriole Court, Carlsbad, California 92011.

19      9.    Defendant Priya Karmali ("Karmali") is an individual who resides at
20  11438 Cypress Canyon Park Drive, San Diego, California 92131.

21      10.   Defendant S.P. Tanis PharmaChem Consulting LLC, d/b/a SPTanis
22  PharmaChem Consulting LLC ("SPTanis") is a California limited liability company
23  and on information and belief, the contracting entity is solely controlled by
24  Defendant Tanis.  On information and belief, its principal place of business is
25  Tanis's residence at 1750 Oriole Court, Carlsbad, California 92011.

26      11.   Plaintiff is ignorant of the true names or residences of the defendants
27  sued herein under the fictious names DOES 1-100.

28

COMPLAINT                           2

1

## JURISDICTION AND VENUE

2    12.   Jurisdiction is proper in this district pursuant to 28 U.S.C. § 1331
3  because Arcturus asserts claims under the Defend Trade Secrets Act, 18 U.S.C. §§
4  1836-1839.  This Court has supplemental jurisdiction over Arcturus' other claims
5  because they form part of the same case or controversy pursuant to 28 U.S.C. §
6  1367(a).

7    13.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and
8  (b)(2) because Plaintiff Arcturus and Defendants Capstan, Tanis, Karmali, and
9  SPTanis reside in this district, a substantial part of the events or omissions giving
10  rise to Arcturus' claims occurred in this district, and because Defendant SPTanis
11  expressly consented to venue in this district in a written agreement with Arcturus.
12  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (b)(3) as to
13  AbbVie because AbbVie conducts business in this district and a substantial part of
14  the events or omissions giving rise to Arcturus' claims occurred in this district.

15    14.   The Court has personal jurisdiction over Defendants Capstan, Tanis,
16  Karmali, and SPTanis because Capstan and SPTanis's headquarters and principal
17  place of business are in California and Tanis and Karmali reside in California. The
18  Court has personal jurisdiction over AbbVie because it conducts business in this
19  district.  Additionally, the claims alleged by Arcturus in this complaint arise from
20  illegal acts committed in California.

21

## BACKGROUND

22

### Arcturus Retains Tanis

23    15.   In March 2015, Arcturus retained Tanis as a contractor for Arcturus
24  through his contractor entity and sole proprietorship, SPTanis.

25    16.   Arcturus did so by concurrently entering into two March 12, 2015
26  agreements with SPTanis:  a Consulting Service Agreement and a Mutual
27  Nondisclosure Agreement, attached as Exhibits A and B to this Complaint (together,
28  the "Agreement").  Tanis was the signatory for SPTanis for both agreements.

17. The Consulting Service Agreement outlined the compensation for Tanis to, among other things, "serve as an independent consultant and advisor" to Arcturus in his "field of expertise." SPTanis was permitted to engage in other business projects and work on other projects from time to time, provided that SPTanis avoid "direct conflicts with the service provided to" Arcturus.

18. Under the Consulting Service Agreement, SPTanis submitted, and Arcturus paid, regular monthly invoices for nearly a decade.

19. The Mutual Nondisclosure Agreement and the Consulting Service Agreement outlined SPTanis' confidentiality obligations to Arcturus, prohibiting unauthorized use or disclosure. The Mutual Nondisclosure Agreement further provided for Arcturus' ownership of feedback from Tanis. The agreement also stated that "[a]ll disputes arising out of this Agreement will be subject to the exclusive jurisdiction and venue of the state courts located in San Diego, California and the federal courts located in the Southern District of California and each Party hereby consents to the personal jurisdiction thereof."

20. Tanis is the alter ego of SPTanis and, as such, is personally bound by the terms of the Agreement. As the sole proprietor of SPTanis, there is such a unity of interest and ownership between SPTanis and Tanis that the separate personalities of SPTanis and Tanis do not in reality exist. Notably, SPTanis's corporate address is the same as Tanis's personal residence. On information and belief, Tanis is the only owner and/or employee of SPTanis such that Tanis controls every act of SPTanis. On information and belief, SPTanis and Tanis comingle funds and SPTanis is a mere shell or conduit for the affairs of Tanis. It would be inequitable if the misconduct of Tanis were treated as the acts of SPTanis alone.

### Arcturus' Years of Development

21. Arcturus uses, and has used over the years, reasonable security measures to protect its trade secrets. Arcturus uses confidentiality agreements with employees and other personnel, with vendors and suppliers, and with other third

parties, to protect its information from unauthorized use and disclosure. Arcturus uses industry standard physical and electronic security measures in its facilities and regarding its electronic systems to protect its sensitive information from unauthorized use and disclosure. Its most sensitive development work is shared internally on a "need to know" basis. These security measures applied to the trade secrets at issue at all relevant times.

22. Over the years, Arcturus disclosed confidential information to SPTanis/Tanis, and SPTanis/Tanis disclosed ideas, suggestions, guidance or other information that were related to Arcturus' confidential information. Under the Agreement SPTanis and Tanis each automatically assigned all rights, title, and interest in such information to Arcturus, and it thus became part of Arcturus' confidential information.

23. Much of Arcturus' development efforts have centered on Lipid Nanoparticles, or LNPs. Broadly speaking, LNPs are a delivery system for vaccines, oligonucleotide therapeutics, and small molecules. LNPs function by forming a structure which encapsulates the drug. LNPs are synthesized by a complicated process that comprises mixing a solution containing the drug with a solution combining different lipid components – for example, cholesterol, phospholipid, pegylated lipid, ionizable lipid – to impart specific properties to the LNPs.

24. Over the course of many years since its founding in 2013, Arcturus developed several generations of lipid structures with increasing potency and biodegradability. The ionizable lipids at issue in this lawsuit are the product of these successive years of trial and error.

25. Ionizable lipids are chemically complex, with multiple chemical moieties in a specific structural arrangement which impart unique properties (e.g., hydrophobic moieties, branching elements, spacer elements, biodegradable elements, pKa modulating elements, and ionizable headgroups) for use in pharmaceutical formulations. These elements of the ionizable lipid are tuned for

both compatibility with small (e.g., siRNA) or large (e.g., mRNA) payloads, as well as biocompatibility, with the goal of creating a molecule which is stable enough to encapsulate and deliver a therapeutic molecule, but also labile enough to degrade without imparting cellular toxicity.  Delivery of nucleic acid payloads has shown clinical and commercial promise – LNPs were used in delivery of the drug ONPATTRO® (patisiran) for treatment of transthyretin-mediated amyloidosis – a disease that can result in organ damage and failure.  Moreover, well-known COVID-19 vaccines are mRNA vaccines that use LNPs to deliver their respective payloads.

26.    In early 2020, Arcturus began working on a new development effort that would ultimately result in the development of the trade secrets at issue:  a new genus of lipids, significantly different from the prior Arcturus generations.  At that time, Arcturus employee Kumar Rajappan ("Rajappan") began sharing ideas with Tanis for new, proprietary lipids, compatible with multiple RNA modalities, that would be highly biodegradable and would allow for efficient manufacturing through a scalable production process.  These factors differentiated Arcturus' new generation of lipids from other LNPs in the industry.  Rajappan and Tanis engaged in lengthy discussions and development work, and Tanis provided his feedback on repeated occasions.

27.    Ultimately, through these efforts, and following years of painstaking prior work and several generations of lipid development, Arcturus developed a new genus of biologically cleavable lipids which were a substantial advance in the field, offering significant advantages including high potency and high degradability (collectively the "Lipid Trade Secrets").

28.    Arcturus' new generation of lipids were different from, and not generally known to or readily ascertainable by, others including competitors, and that remains true for many of the lipids in Arcturus' library which remain secret today.  At all relevant times, these lipids have and have had independent economic value, actual and potential, to competitors as a result of not being generally known

or readily ascertainable, and – as set forth above – were guarded with reasonable security measures.

29. As an example of these development efforts, in December 2020 Rajappan and Tanis exchanged emails to discuss a document containing different prospective lipid structures Rajappan and Tanis had created through iterative discussions and feedback. One section of the document was entitled "Group 2 – Synthesize Later." These were lipid structures that Arcturus invented, but opted to save for future development and commercialization. As such, they are among the Arcturus Lipid Trade Secrets.

30. In particular, the document describes a number of "Group 2" lipids which had, among other things, an acid core. These acid core structures remain trade secrets today as they have never been published, for the reasons described above.

31. Rajappan and Tanis invented other lipid structures, some of which were included in U.S. Provisional Application No. 63/278,242, filed November 11, 2021, entitled "Ionizable Cationic Lipids for RNA Delivery" (the "'242 Application."). Consistent with one promising Arcturus concept of mimicking natural glycerides at a key position in the lipid, these structures contained a glycerol core. A glycerol core is a branching structure with three degradable ester linkers based around a tertiary carbon center.

32. The '242 Application had five named co-inventors, including Tanis, Karmali, and Rajappan. Karmali was familiar with the lipid structures Rajappan and Tanis had developed.

33. In connection with the filing of the '242 Application, Arcturus, Tanis, Karmali and the other co-inventors entered into an agreement regarding the '242 Application" on or about December 17, 2021 (the "Assignment Agreement"). This agreement is attached as Exhibit C.

34. In the Assignment Agreement, Tanis, Karmali, and their co-inventors each "hereby sells, assigns, and transfers" to Arcturus "the full exclusive right, title

and interest for the United States" and other jurisdictions for the '242 Application. Importantly, the Assignment Agreement went further than the contents of the application itself. Its assignment terms also encompassed "all improvements and modifications" of the inventions in the application and its foreign counterparts.

35. Tanis executed the Assignment Agreement on November 30, 2021, and Karmali executed the Assignment Agreement on December 6, 2021.

36. International Application No. PCT/US2022/049607, which claimed priority to the '242 Application, published as WO2023086514A1 on May 19, 2023.

37. Some of the lipids in the broader Arcturus library of new-generation lipids were published in various patent applications, such as the lipids disclosed in the '242 Application. Other lipids were never published and remain secret today.

## Karmali and Tanis Join Capstan

38. On or about January 7, 2022, Karmali resigned from her employment at Arcturus. She joined Capstan soon thereafter in January 2022, taking on the role of Capstan's Chief Technology Officer.

39. On information and belief, Karmali promptly recruited Tanis and SPTanis to perform services for Capstan. Upon information and belief, Capstan entered into a contractor agreement with SPTanis (and Tanis as its alter ego) in early 2022.

40. Despite the direct conflict of interest, Karmali and Tanis did not inform Arcturus that Tanis and SPTanis were working for Capstan. On information and belief, they and Capstan chose to conceal the work of Tanis and SPTanis from Arcturus, in part because they knew Arcturus would object and that it would assert its intellectual property rights.

41. Instead, SPTanis and Tanis continued to send Arcturus monthly invoices for Arcturus consulting work during 2022, which Arcturus paid. He continued to perform services for Arcturus, including in connection with patent

applications where he was a named inventor.  Arcturus did not know that Tanis was covertly working for a competitor, against Arcturus' interests.

## The Capstan '444 Application

42.    On April 5, 2022 – less than three months after Karmali left Arcturus and joined Capstan – Capstan filed U.S. Provisional Application No. 63/362,501 (the "'501 Application"), which was converted as International Application No. PCT/US2023/017647, a patent application entitled "Ionizable Cationic Lipids and Lipid Nanoparticles" that published as WO2023196444A1 (the "'444 Application").

43.    Karmali and Tanis are the sole named co-inventors on Capstan's '444 Application.  The '444 Application first published on October 12, 2023.

44.    In the '444 Application, Karmali and Tanis described and claimed slightly modified versions of the Lipid Trade Secrets from Arcturus' library of lipids. In doing so, they drew upon their knowledge of the Arcturus Lipid Trade Secrets. In fact, the modifications are so slight that Tanis and Karmali could not have chosen the lipids described in the '444 Application absent misuse of the Arcturus Lipid Trade Secrets.

45.    For example, Capstan's lipid structures A-11 and A-12 in the '444 Application are modifications of the Arcturus Lipid Trade Secrets.  These structures are close modifications of Group 2 lipids memorialized in the December 2020 email exchange between Tanis and Rajappan that Arcturus never published – in one case, with only a single atom change.

46.    These modifications of Arcturus' trade secrets remained Arcturus' intellectual property, as a defendant cannot escape trade secret liability by modifying a plaintiff's trade secret.

47.    On information and belief, Capstan renamed lipid structure A-11 "CICL1" in a subsequent patent filing to obtain the company's first U.S. patent directed to LNPs, U.S. Patent No. 12,311,033, issued May 27, 2025 ("'033 Patent").

48.     The Capstan '444 PCT Application does not contain certain technical features that would be expected for such an application.  The absence of certain technical features indicates an intentional decision to attempt to avoid the appearance of drawing on the Arcturus Lipid Trade Secrets.  In addition, Capstan's initial U.S. Provisional Application No. 63/362,501 did not contain a single working example of an ionizable lipid, but was a purely prophetic document. This underscores how Capstan leveraged Arcturus' years of development efforts without undertaking its own, independent development path.

49.     Capstan continued to utilize A-11/CICL1 and analogs thereof in connection with additional patent filings, including International Application No. PCT/US2024/049627 and U.S. Application No. 18/904,951.

50.     On information and belief, Capstan's CPTX2309 asset, used in clinical trials, includes A-11/CICL1 as a key component.  On information and belief, a substantial portion of the value of Capstan's CPTX2309 asset therefore derives from Arcturus' Lipid Trade Secrets.

51.     As another example, on information and belief, Capstan's continued misappropriation resulted in the filing of U.S. Provisional Application No. 63/588,284 ("the '284 Application"), filed October 5, 2023.  The '284 Application was eventually converted to International Application No. PCT/US2024/049627 and published as WO2025076113A1 on April 10, 2025 (the "'113 Application"). Both the '113 and any and all priority documents thereof contain claims generically and specifically covering structures and analogs of the Lipid Trade Secrets, including "CICL-208", which only contains a single atom modification from certain structures in Arcturus' Lipid Trade Secrets.

52.     As noted above, Karmali and Capstan solicited and therefore knew of SPTanis/Tanis' misconduct at all relevant times.  In April 2024, Arcturus wrote Capstan regarding Tanis' misconduct, based on what it had learned at that time.  On April 5, 2024, Arcturus terminated the Consulting Agreement with SPTanis/Tanis.

## **FIRST CLAIM FOR RELIEF**

### **(Breach of Contract Against Tanis and SPTanis)**

53.    Arcturus hereby incorporates Paragraphs 1 through 52, as alleged above.

54.    On or about March 12, 2015, Arcturus and SPTanis entered into the Agreement, with Tanis acting as the sole signatory for SPTanis.

55.    The Agreement is a valid and enforceable contract, intended to protect Arcturus' business interests, including avoidance of direct conflicts and protection of its intellectual property.

56.    Arcturus fully performed or was excused from performing its contractual obligations to SPTanis under the Agreement.

57.    As set forth above, Tanis was bound by the restrictions of the Agreement in his individual capacity as the sole proprietor and alter ego of SPTanis.

58.    SPTanis and Tanis breached the Agreement by engaging in a "direct conflict" during its term by secretly consulting for Capstan while concurrently consulting for Arcturus.  Indeed, SPTanis and Tanis submitted invoices for payment to Arcturus during the same period that they were covertly providing services to Capstan.

59.    SPTanis and Tanis breached the Agreement by misusing the Arcturus Lipid Trade Secrets.

60.    SPTanis and Tanis breached the Agreement by purporting to assign modifications of Arcturus intellectual property to Capstan when such information was already and automatically assigned to Arcturus pursuant to the Agreement.

61.    SPTanis and Tanis have therefore each breached the Agreement, and thereby proximately harmed and caused damages to Arcturus in an amount that will be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract Against Karmali)

62. Arcturus hereby incorporates Paragraphs 1 through 61, as alleged above.

63. Karmali originally joined Arcturus on or about September 21, 2015, through an Employment Agreement. On or about September 7, 2017, Arcturus and Karmali entered into an Employee Confidential Information and Invention Assignment Agreement ("Karmali Agreement"), a copy of which is attached as Exhibit D.

64. The Karmali Agreement requires that Karmali, "during and after" her employment at Arcturus, "not disclose, use, lecture upon, or publish any of the Company's Confidential Information" without authorization from Arcturus.

65. Under the Karmali Agreement, Karmali also agreed that "I hereby assign to Company any rights I may have or acquire in such Confidential Information and recognize that all Confidential Information shall be the sole and exclusive property of Company and its assigns." Karmali further agreed that, apart from certain excluded prior inventions and pursuant to California Labor Code Section 2870, "I hereby assign to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, reduced to practice, or learned by me, either alone or with others, during the period of my employment by Company."

66. The Karmali Agreement is a valid and enforceable contract, intended to protect Arcturus' business interests, including protection of its intellectual property.

67. Arcturus fully performed or was excused from performing its contractual obligations to Karmali under the Karmali Agreement.

68. Karmali breached the Karmali Agreement by misusing the Arcturus Lipid Trade Secrets.

69.    Karmali breached the Karmali Agreement by purporting to assign modifications of Arcturus intellectual property to Capstan when such information was already and automatically assigned to Arcturus under the Karmali Agreement.

70.    Karmali has therefore breached the Karmali Agreement, and thereby damaged Arcturus in an amount that will be proven at trial.

### THIRD CLAIM FOR RELIEF

### (Tortious Interference with Contract Against Karmali and Capstan)

71.    Arcturus hereby incorporates Paragraphs 1 through 70, as alleged above.

72.    Karmali was aware of the terms of SPTanis and Tanis' Agreement with Arcturus, including its prohibition on direct conflicts. Because of Karmali's position with Capstan, Capstan was also aware of these terms.

73.    Karmali and Capstan intentionally interfered with the Agreement between Arcturus and SPTanis and Tanis by retaining SPTanis and Tanis while SPTanis and Tanis was still consulting for Arcturus under the Agreement. They each knew that doing so was inducing a direct conflict between Arcturus and SPTanis and Tanis given that Capstan was a direct competitor.

74.    Karmali and Capstan disrupted the performance of the Agreement by having SPTanis and Tanis covertly perform services for Capstan, to the detriment and injury of Arcturus.

75.    Karmali and Capstan thereby damaged Arcturus in an amount that will be proven at trial.

### FOURTH CLAIM FOR RELIEF

### (Breach of Contract Against Tanis and Karmali)

76.    Arcturus hereby incorporates Paragraphs 1 through 75, as alleged above.

77.    Arcturus entered into the Assignment Agreement with Tanis and Karmali. Each was a valid agreement.

78.    The Assignment Agreement is a valid and enforceable contract, intended to protect Arcturus' business interests, including protection of its intellectual property.

79.    Arcturus fully performed or was excused from performing its contractual obligations to Tanis and Karmali under the Assignment Agreement.

80.    Tanis and Karmali breached the Assignment Agreement by purporting to assign to Capstan modifications of the Lipid Trade Secrets, via the Capstan '444 Application and the '113 Application (and any and all priority documents thereof), which they had already assigned to Arcturus pursuant to the Assignment Agreement.

81.    Tanis and Karmali have therefore each breached the Assignment Agreement, and thereby proximately harmed and caused damages to Arcturus in an amount that will be proven at trial.

## FIFTH CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets (DTSA) Against all Defendants)

82.    Arcturus hereby incorporates Paragraphs 1 through 81, as alleged above.

83.    The DTSA, 18 USC §§ 1836-39, allows an owner of a trade secret to bring a civil action for remedies against trade secret misappropriation where the trade secret is related to a product or service used in interstate or foreign commerce. The DTSA permits courts to issue injunctions and allows for a range of monetary remedies.

84.    Arcturus dedicated and continues to dedicate substantial resources to developing trade secrets, including the Lipid Trade Secrets.  Arcturus is the owner of the trade secrets at issue.

85.    The Lipid Trade Secrets are directed towards biocompatible, ionizable, cationic lipids for use in generation of LNPs for use in delivery of drug payloads such as mRNA. The Lipid Trade Secrets are related to potential treatment for diseases, including but not limited to metabolic disorders and disorders of the lungs,

and for various prophylactic and therapeutic vaccines that have been continually under development by Arcturus and are intended for use throughout the United States and foreign countries as well.  The Lipid Trade Secrets are related to a family of lipids that have the potential to enable a vast array of drugs that rely on the delivery of a nucleic acid such as mRNA.

86.    At the time of misappropriation, the Lipid Trade Secrets derived independent economic value from not being generally known to the public, or to Arcturus' competitors, or to other persons who could obtain economic value from disclosure or use of the information.

87.    At the time of misappropriation, the Lipid Trade Secrets were not readily ascertainable through proper means or from generally available, public sources.

88.    At all relevant times, Arcturus made reasonable efforts to protect and preserve the secrecy of the Lipid Trade Secrets not contained in published patent applications.

89.    Among other things, the Group 2 lipids memorialized in the December 2020 email exchange between Tanis and Rajappan that Defendants misused were part of such Lipid Trade Secrets not contained in published patent applications.

90.    The modification of the trade secret of another without authorization constitutes trade secret misappropriation, and such modification is not a defense to a misappropriation claim.  Thus, Defendants' modification of the Lipid Trade Secrets constitutes trade secret misappropriation.

91.    Tanis, SPTanis, Karmali, and Capstan misappropriated the Lipid Trade Secrets within the meaning of 18 USC § 1839(5) by, at a minimum, using them in Capstan's internal development efforts, disclosing modified versions of them in the '444 Application and the '113 Application, and using them as part of a technology portfolio to successfully entice AbbVie in acquiring Capstan.

92.    Tanis, SPTanis, and Karmali had actual knowledge of the Lipid Trade Secrets, in particular because Tanis and Karmali were named co-inventors on the '242 Application.  They each had actual knowledge of Capstan's trade secret misappropriation, including through the filing of the '444 Application and its priority documents on which Tanis and Karmali were the sole named inventors.  Thus, they each knew, at the time of the misappropriation, that the Lipid Trade Secrets had been acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that they did not have authorization from Arcturus to do so.

93.    Because Karmali was an employee of Capstan and served as Capstan's Chief Technology Officer, Capstan had actual knowledge of the misappropriation of Arcturus' trade secrets.  Thus, Capstan knew, at the time of the misappropriation, that the Lipid Trade Secrets had been acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that it did not have authorization from Arcturus to do so.

94.    On information and belief, AbbVie knew or had reason to know of Capstan's trade secret misappropriation before it closed its acquisition of Capstan. Among other things, Capstan, on information and belief, disclosed the April 2024 letter exchange with Arcturus to AbbVie during acquisition diligence.  AbbVie nonetheless chose to close its acquisition of Capstan and therefore to acquire Capstan's tainted assets and to continue the ongoing trade secret misappropriation. Thus, AbbVie, at the time of the continuing misappropriation, knew or had reason to know that the Lipid Trade Secrets had been acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that it did not have authorization from Arcturus to join the ongoing misappropriation.

95.    As a direct, proximate, and foreseeable result of Defendants' misappropriation of the Lipid Trade Secrets, Arcturus has been damaged, and Defendants have been unjustly enriched, in an amount to be determined at trial.

96.    Defendants' unlawful actions were willful and malicious, entitling Arcturus to exemplary damages and/or attorneys' fees pursuant to 18 USC § 1836(b)(3)(D).

97.    Arcturus is entitled to an order requiring Defendants, their agents, and all persons acting in concert with them, from using or disclosing, or threatening to use or disclose, the Lipid Trade Secrets, and restraining Defendants from obtaining any benefit from their wrongful possession and use of the Lipid Trade Secrets. Unless enjoined by this court, continuing misappropriation will cause great and irreparable injury to Arcturus.  Arcturus has no adequate or other remedy at law for such acts.

## SIXTH CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets (UTSA) Against all Defendants)

98.    Arcturus hereby incorporates Paragraphs 1 through 97, as alleged above.

99.    The California UTSA, Civil Code §§ 346.1 et seq., allows a trade secret plaintiff to bring a civil action for remedies against trade secret misappropriation. The California UTSA permits courts to issue injunctions and allows for a range of monetary remedies.

100.    Arcturus dedicated and continues to dedicate substantial resources to developing trade secrets, including the Lipid Trade Secrets.  Arcturus is the owner of the trade secrets at issue.

101.    The Lipid Trade Secrets are directed towards biocompatible, ionizable, cationic lipids for use in generation of LNPs for use in delivery of drug payloads such as mRNA. The Lipid Trade Secrets are related to potential treatment for diseases, including but not limited to metabolic disorders and disorders of the lungs,

and for various prophylactic and therapeutic vaccines that have been continually under development by Arcturus and are intended for use throughout the United States and foreign countries as well. The Lipid Trade Secrets are related to a family of lipids that have the potential to enable a vast array of drugs that rely on the delivery of a nucleic acid such as mRNA.

102. At the time of misappropriation, the Lipid Trade Secrets derived independent economic value from not being generally known to the public, or to Arcturus' competitors, or to other persons who could obtain economic value from disclosure or use of the information.

103. At all relevant times, Arcturus made reasonable efforts to protect and preserve the secrecy of the Lipid Trade Secrets not contained in published patent applications.

104. Among other things, the Group 2 lipids memorialized in the December 2020 email exchange between Tanis and Rajappan that Defendants misused were part of such Lipid Trade Secrets not contained in published patent applications.

105. The modification of the trade secret of another without authorization constitutes trade secret misappropriation, and such modification is not a defense to a misappropriation claim. Thus, Defendants' modification of the Lipid Trade Secrets constitutes trade secret misappropriation.

106. Tanis, SPTanis, Karmali, and Capstan misappropriated the Lipid Trade Secrets within the meaning of California Civil Code § 3426.1(b) by, at a minimum, using them in Capstan's internal development efforts, disclosing modified versions of them in the '444 Application and the '113 Application (and any and all priority documents thereof), and using them as part of a technology portfolio to successfully entice AbbVie in acquiring Capstan.

107. Tanis, SPTanis, and Karmali had actual knowledge of the Lipid Trade Secrets, in particular because Tanis and Karmali were named co-inventors on the '242 Application. They each had actual knowledge of Capstan's trade secret

misappropriation, including through the filing of the '444 Application on which Tanis and Karmali were the sole named inventors.  Thus, they each knew, at the time of the misappropriation, that the Lipid Trade Secrets had been acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that they did not have authorization from Arcturus to do so.

108.   Because Karmali was an employee of Capstan and served as Capstan's Chief Technology Officer, Capstan had actual knowledge of the misappropriation of Arcturus' trade secrets.  Thus, Capstan knew, at the time of the misappropriation, that the Lipid Trade Secrets had been acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that it did not have authorization from Arcturus to do so.

109.   On information and belief, AbbVie knew or had reason to know of Capstan's trade secret misappropriation before it closed its acquisition of Capstan. Among other things, Capstan, on information and belief, disclosed the April 2024 letter exchange with Arcturus to AbbVie during acquisition diligence.  AbbVie nonetheless chose to close its acquisition of Capstan and therefore to acquire Capstan's tainted assets and to continue the ongoing trade secret misappropriation. Thus, AbbVie, at the time of the continuing misappropriation, knew or had reason to know that the Lipid Trade Secrets had been acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that it did not have authorization from Arcturus to join the ongoing misappropriation.

110.   As a direct, proximate, and foreseeable result of Defendants' misappropriation of the Lipid Trade Secrets, Arcturus has been damaged, and Defendants have been unjustly enriched, in an amount to be determined at trial.

111.   Defendants' unlawful actions were willful and malicious, entitling Arcturus to exemplary damages and/or attorneys' fees and costs pursuant to California Civil Code § 3426.4.

112.   Arcturus is entitled to an order requiring Defendants, their agents, and all persons acting in concert with them, from using or disclosing, or threatening to use or disclose, the Lipid Trade Secrets, and restraining Defendants from obtaining any benefit from their wrongful possession and use of the Lipid Trade Secrets. Unless enjoined by this court, continuing misappropriation will cause great and irreparable injury to Arcturus.  Arcturus has no adequate or other remedy at law for such acts.

## SEVENTH CLAIM FOR RELIEF
### (Correction of Inventorship for the '033 Patent)

113.   Arcturus hereby incorporates Paragraphs 1 through 112, as alleged above.

114.   On May 31, 2024, Capstan filed with the United States Patent and Trademark Office ("USPTO") a patent application bearing the application serial number 18/731,223 ("the '223 Application"). That application became the '033 Patent, which is assigned to Capstan. A true and correct copy of the '033 Patent is attached as Exhibit E, and its corresponding certificate of correction attached as Exhibit F.

115.   The '033 Patent is generally directed to lipid nanoparticles comprising specific cationic ionizable lipids.

116.   Claim 1 of the '033 Patent recites:

A lipid nanoparticle (LNP) comprising a lipid compound comprising:

about 35 to 65 mol % an ionizable cationic lipid of structure

1
2
3
4
5
6
7
8
9
10
11
12

13    where R is

14
15
16
17

18    about 0.5 to about 3 mol % PEG-lipid comprising functionalized PEG-

19            lipid and non-functionalized PEG-lipid,

20    about 7 to about 13 mol % a phospholipid, and

21    about 27 to about 50 mol % a sterol.

22 Claim 1 of the '033 Patent.

23    117.   The '033 Patent names only Priya Karmali, Steven Tanis, and Yanjie

24 Bao as inventors.

25    118.   Kumar Rajappan made significant contributions to the conception of

26 the subject matter of one or more claims of the '033 Patent, yet the '033 Patent does

27 not list him as an inventor.

28

119.   For example, Rajappan contributed to the conception of at least the Group 2 lipids and other structures in Arcturus' lipid library, including those with an acid core as shown in Claim 1 of the '033 Patent.  Thus, Rajappan contributed to the conception of at least Claim 1 of the '033 Patent.

120.   At the time the subject matter of at least one claim of the '033 Patent was conceived, Tanis and Rajappan were obligated to assign rights to any inventions to Arcturus pursuant to the Assignment Agreement and other agreements.

121.   On information and belief, Capstan controlled the preparation, filing, and prosecution of the '223 Application. Capstan failed to name Kumar Rajappan as an inventor of the '223 Application. By failing to include Kumar Rajappan, Capstan prevented Arcturus from securing patent rights in the inventions claimed in the '033 Patent.

122.   Arcturus is entitled to an order directing the Director of the USPTO to correct the '033 Patent to include Kumar Rajappan as a named inventor of the '033 Patent pursuant to 35 U.S.C. § 256.

123.   Arcturus has no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF
### (Declaratory Judgment Against all Defendants)

124.   Arcturus hereby incorporates Paragraphs 1 through 123, as alleged above.

125.   There exists an actual and justiciable controversy between Arcturus, Capstan, SPTanis and Tanis, and Karmali as to who owns the modifications to the Lipid Trade Secrets including as pertains to the contents of the '444 Application and the '113 Application, and any and all priority documents thereof.  Accordingly, pursuant to 28 U.S.C. §§ 2201-02, Arcturus requests a judgment declaring that:

(1) Arcturus is the rightful owner of any modification of the Lipid Trade Secrets, wherever they appear, whether that is in Defendants' research,

technology, or patent applications and that Defendants' transfer ownership rights to any improvement or modification to the Lipid Trade Secrets;

(2) To that extent, Arcturus has ownership rights to the '444 Application, the '113 Application, and any priority documents, continuations, divisionals, or reissues and is at least a co-owner of the '444 Application and the '113 Application, and any continuations, divisionals, or reissues as a result; and

(3) To that extent, Defendants must transfer ownership rights of the '444 Application and the '113 Application, and any priority documents, continuations, divisionals, or reissues to Arcturus.

## **PRAYER FOR RELIEF**

Arcturus requests that the Court enter judgment as follows:

(1)    For judgment in favor of Arcturus;

(2)    For a permanent injunction prohibiting Defendants from use or disclosure of the Lipid Trade Secrets (including modifications) and a head start injunction as necessary to remedy Defendants' unlawful advantage arising from trade secret misappropriation;

(3)    For a permanent injunction against Defendants, and any persons in active concert or participation with them: (i) enjoining Defendants under a head-start injunction to remove any unjust advantage they obtained as to the portion of the Lipid Trade Secrets which published; (ii) with respect to the portion of the Lipid Trade Secrets which did not publish, enjoining Defendants from obtaining, retaining, using, transmitting, disseminating, or disclosing the Lipid Trade Secrets; (iii) ordering Defendants to identify, and turn over, any property in their possession, custody, or control containing or reflecting the Lipid Trade Secrets (including modifications), including hard copy documents or any form of electronic storage media; (iv) ordering Defendants to identify any other persons, entities, or locations not within their

possession, custody, or control, to which Defendant has transmitted, disseminated, disclosed, or stored any Lipid Trade Secrets (including modifications); (v) with respect to the Lipid Trade Secrets (including modifications), where Defendants purported to assign intellectual property rights to Capstan and now AbbVie, requiring Defendants to assign to Arcturus any rights to patents, patent applications, or other intellectual property that incorporates the Lipid Trade Secrets (including modifications); and (vi) any other appropriate injunctive relief;

(4)   For disgorgement of unjust enrichment, in an amount to be determined at trial;

(5)   For compensatory damages, in an amount to be determined at trial;

(6)   For reasonable royalties, in an amount to be determined at trial;

(7)   For an order to return any trade secrets or confidential information in the possession of any Defendant;

(8)   For a finding that Rajappan is an inventor of the invention claimed in the '033 Patent and for the Court to enter an order instructing the Director of the USPTO to issue a certificate of correction correcting the inventorship of the '033 Patent accordingly;

(9)   Pre-judgment and post-judgment interest;

(10)  An award of exemplary damages, attorneys' fees, and costs, as this Court deems just and proper; and

(11)  For such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff Arcturus demands a jury trial on all triable issues.

Dated:  September 23, 2025          Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI, P.C.

By: */s/ John P. Flynn*
        John P. Flynn
*Attorneys for Plaintiff Arcturus Therapeutics, Inc.*
E-mail: jflynn@wsgr.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## EXHIBITS TO COMPLAINT

### TABLE OF CONTENTS

| No. | Exhibit Description | Exhibit Page Nos. |
|-----|---------------------|-------------------|
| A | March 12, 2015 Consulting Service Agreement between SPTanis PharmaChem Consulting LLC and Arcturus Therapeutics, Inc. | 27-29 |
| B | March 12, 2015 Mutual Nondisclosure Agreement between SPTanis PharmaChem Consulting LLC and Arcturus Therapeutics, Inc. | 30-34 |
| C | December 17, 2021 Assignment Agreement for U.S. Application No. 63/278,242 | 35-42 |
| D | September 21, 2015 Priya Karmali Employment Agreement | 43-47 |
| E | United States Patent No. 12,311,033 B2 | 49-174 |
| F | United States Patent and Trademark Office Certificate of Correction for Patent No. 12,311,033 B2 | 175-176 |